Okay, our 11 o'clock case is case number 4140615. People v. Hilliard for the appellant, Erica Nichols Cook for the athlete, Allison Paige Brooks. May it please the Court, Counsel, I'm Erica Nichols Cook with the Office of the State Appellate Defender here today on behalf of Mr. James Hilliard. Your Honors, we're here today because the State failed to prove an essential element of the charge of an aggravated discharge of a firearm in Mr. Hilliard's trial. The State was required to prove that Mr. Hilliard discharged a firearm into the James' house from outside of the house and that he personally did that while knowing the home was occupied. Here, the statute defines a firearm as a device by whatever name is known that's designed to expel a projectile or any projectiles by the action of an explosion, expansion of gas, or escape of gas. The statute specifically excludes BB guns, spring guns, and other types. So the State had the burden to prove this was a firearm within the statutory definition. There was no direct evidence of any firearm being discharged into this house. Nobody saw a firearm. Nobody even heard gunshots. The circumstantial evidence that was presented to this element of the offense included the homeowners, Lindsay and Sharia James, hearing glass break, not finding anything before they went to bed. The next morning, Sharia James finding broken glass and a hole in the window. And then her husband and a police officer doing a trajectory test with a pencil, which led them to the TV area where they didn't find anything. And then 15 feet away, finding an object, flattened, deformed object in a heating vent. And then at trial, Mr. James and Officer Barrows speculating or guessing that it would look like a .22 caliber bullet, fragment, flattened, deformed bullet. But we have no ballistics. We have no scientific evidence that this recovered object was even made of lead, that it would have come from a firearm within the statutory definition. We have nothing here that satisfies this element of aggravated discharge of a firearm. The state never recovered any weapon or ammunition that they could link to the object that they recovered in the heating vent or to Mr. Hilliard. They had speculation by Officer Barrows and Mr. James who both readily admitted they were not experts in ballistics or in determining the size or caliber of a firearm. Even if we assume that a firearm was discharged into this house, there was not sufficient reliable evidence that it was Mr. Hilliard who personally discharged a firearm. The state presented surveillance video from a gas station down the road from this house that they, Detective Avanzella reported, showed. Sharia James driving home, followed by a car consistent with Mr. Hilliard's car. And this video occurs at least 30 minutes prior to hearing any glass break when the supposed shot would have occurred. The video doesn't place Mr. Hilliard outside of the home. It doesn't place him with a gun. It doesn't satisfy proof beyond a reasonable doubt that Mr. Hilliard discharged a firearm into this house. If the court were to find that the state has proved the elements of this offense, that it was a firearm and that Mr. Hilliard may have discharged that firearm, this court should still reverse this conviction and remand for a new trial because of all the errors associated with the evidence presented at Mr. Hilliard's trial. First, there's the lay witness opinion testimony that this was a .22 caliber bullet that I briefly mentioned before. Our argument talks about Rule 701 and 702 and the difference is here, these witnesses were not qualified as experts to provide any testimony about a scientific or technical nature. And the court has previously held that ballistics, identifying bullets, is scientific or technical. And so Rule 702 would require that they be qualified by training experience and that did not occur. Was there an objection on that basis? No, Your Honor, there was not. Which leads to my ineffectiveness in the counsel argument. Here, trial counsel not only didn't object, he kind of exacerbated the problem with Mr. James' testimony. And all this led to the prejudice of allowing the state to argue that it was a .22 caliber pistol. That Mr. Hilliard fired a .22 caliber firearm into this house and that they didn't have to have the gun. But we know Mr. Hilliard had some firearm paraphernalia in his house. They found an empty box. No date, no connection to this offense, no connection to the object recovered. But it allowed the state to make that inference in that argument and it went without being objected to. In addition to the problems with that evidence, the second piece of evidence is the gas station surveillance video. Your Honors, I attached three slides that the state used at the trial for the court's convenience to the brief to show the video and the evidence that Detective Appenzeller was narrating and explaining to the jury. The first two are supposedly Lakeshore Drive where you can see Ms. James' car followed by Mr. Hilliard's car or a car similar, consistent with theirs. When I look at these videos, I don't even know where Lakeshore Drive is. If I didn't have Detective Appenzeller's testimony telling me what I was looking at, I wouldn't know the significance of these. So that leads into argument two where Detective Appenzeller's explanation violates this court's rule establishing people that if a video comes in as substantive evidence, then someone without personal knowledge like Detective Appenzeller can't narrate and explain what's being shown on that video. It was for the jury to decide if they saw a vehicle similar. Ms. James is never asked to look at the video. She never identifies her car on the video. Detective Appenzeller tells the jury what to see. And this is the only piece of evidence that remotely places Mr. Hilliard near this house or can explain how he found Ms. James. He has no connection to Sharia and Lindsay James. That leads into our third piece of evidence which was the letters, the notes, the calendar entries that the police recovered from Mr. Hilliard's home. There was over 30 pages admitted as exhibits. And they don't talk about Sharia and Lindsay James. They don't talk about guns. They don't talk about trying to intimidate or scare Mr. Hilliard's former girlfriend, Christy. They talk about their sexual and romantic relationship. They talk about his concerns about her and her son, about his following of her, taking pictures of her. In essence, they're evidence of prior bad acts that the trial court says relate to motive. And trial counsel objects on relevance, but then after the court's ruling, he fails to request IPI 3.14 that would let the jury know this 30 pages of documents that make Mr. Hilliard look like a bad person can only go towards his motive, that can only show his connection to Sharia and Lindsay James. Otherwise, without this, they can't explain why Mr. Hilliard would go shooting to this house at 11 o'clock, 1130 at night, or even how he found that house because there's no other relationship or evidence that would connect them together. In addition to this weak circumstantial evidence and all the problems and errors associated with it, we have the additional error in argument four of the state showing a video of Mr. Hilliard requesting counsel of his invocation of his constitutional right to have an attorney. It's his interrogation or questioning by Detective Appenzeller when he's shown these photos and said, this is your car, and he says, no, I can't say it's my car and I want an attorney. The court had ruled earlier you can't show that for all the reasons this court's aware of. Someone's request for counsel is not evidence of guilt. It can't be substantively used to show their guilt. And this jury saw that, heard that, and then was never given any guidance on what to do with that piece of evidence. There's no jury instruction given. There's no cautionary information provided. They just know he's shown these photos and all of a sudden he wants an attorney. And that's powerful evidence that they should never have seen. And it compounds this other weak circumstantial evidence and the errors associated with each piece of it. So alternatively, if this court finds the state established a district or a firearm occurred, if any one of these errors is not sufficient to grant Mr. Hilliard a new trial, then the cumulative effect of these errors, all four of these major errors, and the ineffectiveness of the counsel that Mr. Hilliard received, entitles him to a new trial. And we have Akinzeller narrating a video that was also admitted as substantive evidence and should have spoke for itself. We have these overabundance, 30-some pages, with all these references to a romantic relationship with someone who's not even the victim being admitted, but no guidance to the jury on why they're being admitted, except to show he's a bad person. We have his request for counsel, and we have lay witnesses giving an opinion that this is a bullet, and the state arguing that based on that testimony and the things found in his house, we know he fired a .22 into that house. Lay witnesses aren't supposed to give an opinion. They can testify to the size, the shape, something on their own perception, but they can't say this was a .22 caliber bullet. For all these reasons, we ask this court to reverse Mr. Hilliard's conviction for aggravated discharge of a firearm. The state failed to prove the essential elements of this charge, and in the alternative, the trial errors that occurred in this case entitle Mr. Hilliard to a new trial. The court doesn't have any questions for me. I see none. Thank you. You'll have rebuttal. Good morning, Your Honors. I'm Allison Paige Brooks, appearing on behalf of the people. May I please support and counsel? First of all, the defendant claims that he has no connection to Sharia James, who's the victim of the firearm discharge that entered her house.  the fact that he had no connection to Sharia James The fact that there is something that he put in his calendar entry for that day, which was the license plate registration tag for her car, which was 22521RM. And so that is something that helps corroborate the evidence that shows that Kristi Krietemeyer told Detective Appenzeller, the defendant left, quote, almost right after James. James was a DCFS investigator who had visited Krietemeyer's residence in response to a DCFS complaint filed by the defendant. She testified at trial. It was 20 minutes later. She testified at trial. That's true. That's what she said. But then she also backtracked from that when she then said it could have been less. And then the other evidence that comes in substantively that she told the police that it was almost right after. Now, when this court reviews sufficient evidence arguments, it does so in light most favorable to the prosecution. So when there's conflicts in the evidence, it can be resolved simply by the prior fact of jury in the state's favor, then there is evidence of this existence that the defendant left almost right after James. Was there evidence in his house that indicated he was writing other license plates down too? Yes. Also in the calendar there's a previous day he was in Pano with Krietemeyer. He wrote down a license plate tag for a pickup truck for somebody that Krietemeyer actually went with in that case. In this case he believed from the calendar entry, the statement in the calendar entry he made, he believed that Krietemeyer was in Sharia James' car, which was actually not the case because Krietemeyer stayed at her own place. James went back to her own home. So that was an erroneous belief. Krietemeyer also testified that she was standing outside when he left his home. It's true that she was standing outside. And that was after Sharia left there. Right. But if the defendant is leaving following James, thinking that she's in the car, his statement is powerful evidence that that's what he actually believed. Whether he might have been able to see Krietemeyer, if he was looking in the correct direction, that's not something this court has to accept in a light, most favorable to the prosecution. So the important point, though, is that the Huffs video, given the fact that there is the evidence of cars very similar to the defendant with the black rims and the color, and the juror can look at this picture when the car does the U-turn and actually through the lot the second time. The first time it was in the background and it was much harder to see. Although there's no picture of the driver visible, there's no license plate tag of the defendant's car, the car that's most similar to the defendant's car, visible from that particular image of the second pass-through. And the testimony in the record is that according to the opinion of Detective Abenzoler, this is very consistent with the defendant's car. Now the defendant's sufficient evidence argument tries to say that the evidence in this opinion was inadmissible. Well, just for the purposes of this particular argument, whether that evidence was inadmissible or not doesn't really matter. It's only what was the record evidence that was actually admitted to the trial sufficient to prove the case beyond a reasonable doubt. And if evidence was in fact improperly admitted and that was cause for this court to reverse and remand for a new trial, then double jeopardy does not bar that retrial if the evidence was inadmissible. So this court should disregard the references to the defendant's argument that the case was insufficient to convict because some of this evidence was inadmissible. But the Huggs video then shows, and the jury can conclude, that the defendant was following within seconds behind James. James didn't even identify the video or her car in the video. She wasn't even shown the video in the courtroom. Yes, she was not saying that that was my car. You can't see the driver of the white car, and you can't see the driver of the car behind her. You can't even really see the car of the driver behind the white car. But it's a reasonable inference that the jury can make based on Sharia James' description of the path that she took to drive home, which took her right down the same street that's depicted in the Huggs video, at about the same time that she's going into her house. Minutes later, if you have that video and that camera facing on that road and she passes by that road sometime during the time period that that camera is filming... There's no testimony that she passed by that road. I mean, that car in the video is her passing by. I understand, Your Honor. Your point is that she never identified her car in the video.  But she provided testimony as to her path of travel. The video displays that particular road that she said that she testified that she traveled along. And so the jury can make a reasonable inference that that was, in fact, her car. And Appenzeller even testified that that car was, in fact, consistent. And that's evidence in support of the State's theory of the case, even if she didn't say that that was her car. The fact... The combination of circumstantial evidence, the fact that he left almost right after her, he's on a video with cars consistent with him seconds behind on that same road, and that taillights end up pausing and hesitating at the end of her driveway after she drives into her garage that her husband notices. And then there's this car that loops around, makes the U-turn, comes back through the huff slot, and then about a half hour later there's a shot that goes to the window. Well, nobody testified to hearing a gunshot, did they? They heard the sound of breaking glass. Right. Neither Lindsey or Sharia even testified that they heard a gunshot. That's true, but they heard glass breaking, and they saw the defect in the glass, and they identified it as a bullet hole, and then they later found a bullet projectile. So that is all established in the record. I'm not sure it was established it was a bullet projectile. Well, there was on record Volume 2278. Oh, they testified to their opinion, but I'm saying whether that was sufficient evidence to even prove it. Go ahead. Okay. Well, the opinion was that this is an important point. He testified in his opinion based on his experience the window had a bullet hole. Okay, here it is. Volume 2278 episode testified the projectile from the house had the quote general appearance and consistency of that with a lead bullet that was fired through the window. So there is evidence in the record, and even if this court believes that was somehow improper opinion testimony, that does not mean that retrial is barred by double jeopardy because the evidence was insufficient to convict, because there is that evidence that this was a lead bullet, that it had been a bullet hole and not something like a BB gun. What evidence was there that this was a lead bullet? There was no evidence at all that this item that was found in the vent contained lead. No scientific testing, but that was what the testimony was that this was in appearance as a lead bullet, consistent with. Not scientifically established beyond a reasonable doubt, but that's not a necessary element to be proved by scientific evidence. This is the case where it looks like a bullet, the fragment makes a high velocity impact through the window. So in their experience, the officers can testify that this was in fact a bullet hole and that the fragment looked like a bullet, the flattened bullet, and that is proof that this is not in fact a BB gun shooting, for example, or that a rock somehow got kicked off the tire of a vehicle. Is there any evidence which would tend to establish where the shooter would have been when the gun was discharged? Anything at all on that? Right. And I understand your question as being directed towards the element of the indirection of required element to prove the case. Yes. I mean, 22 long rifles travel a long ways. I think the boxes say they can go a mile. So I'm just trying to say, did the state attempt to or show where the shooter would have been? They used a pencil to establish a trajectory through the window. And the fact that the bullet ended up inside the house and there's a hole in the window makes a reasonable inference that the shooter was outside the house, firing into the house. Right. I'm saying how far outside the house. A quarter of a mile away, 100 yards. Did somebody else's yard on the street? Maybe there's nothing in the record regarding that. My question is, did the state establish anything? I don't remember. There's probably no way to determine exactly how far away the shooter would have been. But the element is whether it was fired in the direction into the house. And I'm not sure if I remember if there was like some wooded area or something across the street. That's what I was getting at. Could the shooter have been on the street? Or you're saying there might have been a wooded area? I think there was evidence that there might not have been another house across the street. It might have been a wooded area. I don't remember. It's a Lakeshore Drive area. There was some testimony about that. But an important point is not only is the defendant following her in pain on the previous day and therefore following her again this time, he's believing that she's engaging in prostitution. And the motive and the circumstantial evidence combine here in a powerful way. Because as the defendant claims, there was no connection between him and the victim, the connection is Creedermyer. His belief that she's engaging in prostitution with men. His insistence that police were doing nothing about it and he wanted it stopped. And of course, this was his method eventually after watching her in pain on the previous day and watching her in what he believed to be her going to the home of another man. Again, this next day, this was his method to stop what he believed was prostitution by her. And the defendant also in his police interview insisted that he went for coffee at Steak and Shakes in Pershings and then home and nowhere else. But yet, the strong evidence showing that he was in fact at Huck's around 1028, 1025, passing that area, much closer to the victim's home, shows that the defendant is lying, consciously lying because he knows he's guilty and he knows he did this. It's a very strong reasonable inference that his lies to the police, because the jury can accept that's his part in the video, then can accept that he's lying to police and he's doing so because he knows he's guilty. He knows he's the one who fired this gun. And so the proof was sufficient beyond a reasonable doubt. With respect to lay opinions, the defendant claims that there was narration of the video and what the defendant tried to keep out for trial and has succeeded in doing so is most in particular to narration of events depicted on the video, including the U-turn on Williams Street. So there's no reference to that in the testimony. That was kept out in accordance with Sykes' discourse decision. However, what the defense said was okay was what exactly was the limited extent of Appen's lawyer's testimony, which was that these cars were consistent with the defendant's vehicle and Sharia James' vehicle. And that was fine with the defendant. And he made that clear that that was okay with him. And so this is a situation of invited error acquiescence, if that were in fact improperly lay opinion testimony, because the defendant got exactly what he was asking for in his ruling and then now is complaining on appeal that somehow the trial court didn't go far enough in limiting the testimony. And also when the defendant talks about not understanding where Lakeshore Drive is in the video and that the video should have been allowed to speak for itself, well this is exactly why lay opinion testimony comes in with respect to videos, to show that these cars were driving in a particular direction on a certain street and this video shows that. And because a witness can go to the scene of Huck's and look at the video and look at the street and understand where that is and explain that for the jury, which is not allowed to go to the scene of crimes or scene of events like this Huck station, they cannot see for themselves that's Lakeshore Drive and this is going south. That's something that a lay witness should be allowed to provide that information, which is very helpful to them. So that part of the evidence was in fact admissible and the lay witness rule does not bar that kind of opinion testimony. And with respect to the argument that there was no scientific testing, with respect to the caliber of the bullet in defense, the witness admitted he's not an expert, but he doesn't have to have scientific or technical expertise to say that given the relative size of the fired bullet, it looked like a .22. That is the limited extent of that opinion and so therefore he didn't need expertise to say it was in fact a .22 because he never testified it was in fact a .22. And when the prosecutor then argues in closing argument that the defendant had fired a .22 caliber gun, that was based on reasonable inferences from all of the evidence, not just what Officer Barrows thought the fragment looked like, but including what the defendant possessed, an empty box that was for a .22 caliber firearm. That is an inference that the defendant had disposed of the firearm after shooting it through the window at Sharia James' house. There was other testimony from his son that that gun had been given to somebody else. True, Your Honor, and that's something this Court can consider in the balance of all the evidence because this Court doesn't just look at the evidence favorable to the State's theory, but has to decide whether all of the evidence is so inconsistent or so unreasonable and unsatisfactory as to constitute a reasonable doubt of guilt. And the fact that the defendant has a defense saying that I did not go anywhere but steak and shake that night and that I gave the gun to somebody else, all those statements... Years before, though. Years before. I understand that, but the jury can disbelieve that. The jury does not have to accept that. This Court does not have to accept that as true when reviewing the evidence in a light most favorable to the prosecution. The fact that there's contradictory evidence does not mean the defendant is entitled to an outright acquittal. So there is some testimony... I mean, there is no eyewitness, and there are some deficiencies in the State's case, but that does not mean the proof is so unsatisfactory that double jeopardy requires him to receive an outright acquittal. And so with respect to motive, motive was very crucial here because that provides an explanation for what was really sort of unexplicable, why this man would follow somebody and shoot through a window. And the fact that the notes and letters referred to romantic and sexual relationships  but also the extent of his fascination and fixation with Friedermeier, and it shows the importance of his belief that she was engaging in prostitution and how personally important that was to him because he's not just a concerned citizen thinking there's prostitution happening in his neighborhood or a prostitute lives down the street. This is somebody he was personally, sexually, and romantically involved with. And this is why he's willing to go so far as to fire a gun through a window of a home he thinks that she's inside as a way of deterring her from engaging in further prostitution activities according to his own erroneous beliefs. So that's why it did not become a focal point of the trial, though, because the prosecutor barely mentioned this stuff in the closing argument. So it's not like a situation where somehow this overwhelmed all the other evidence and distracted the jury from deciding the case on relevant issues. With respect to invocation of right to counsel, there was error, but this was inadvertent error. It was not highlighted. And the defense's failure to request a curative instruction seems strategic, particularly in the fact that the defense is citing this only for the first time after the defendant is found guilty by the jury. So now he's entitled to a new trial, and the trial court should have given a sua sponte mistrial. It is the argument after trial, only after trial, because the defendant is holding this in the back pocket as a strategic matter waiting to see if he's going to get convicted or acquitted in a case that the defense could perceive as being somewhat weak for the prosecution and hoping that the jury might acquit, rather than forcing the defendant to go through a second trial because, oops, this reference to the right to counsel came in erroneously. He's holding this mistrial in his back pocket, now preserving it as an issue on a review. Ms. Brooks, that was inexcusable. They had a discussion before that tape was ever played on the record but outside the presence of the jury. It was inexcusable what happened there. And now defense counsel's in a trick bag because he's got to decide, does he bring it to the jury's attention and highlight it, or does he just hope that they forget about it? I mean, it's unbelievable that that happened in this trial, the way it was handled pre-trial. I understand it is the prosecution's fault, and it does put the defendant in a difficult bind because he does have to make that decision whether to highlight the evidence potentially for the jury. But there's nothing to show that this was anything but entirely inadvertent. And if it is harmless error under the Dameron-type test, there's not going to be second-pronged claim error. So it can't be harmless. And so here, because it's not emphasized, it's not highlighted in any way. And this very brief mention is something that, after the fact, the parties noticed that this was, in fact, something that the jury heard, and it was discussed. It's not a basis for a new trial. Well, they knew ahead of time it was on the tape and that they weren't supposed to play it. Ideally, they should have excised that and created a new copy of the recording to make sure it wouldn't have happened. That would have been the ideal approach to do it. For some reason, and the record doesn't show why, the tape didn't get stopped in time. And that is the prosecution's fault. That is not assuming the defendant is automatically entitled to a new trial. If it's harmless, there's no objection made to it, and the mistrial request comes too late. There's no request for a curative instruction. Why is it harmless? Because the evidence was so overwhelming, or what? No, because of the Dameron factors. There's six Dameron factors, and the fact that there's really not many of them that apply in favor of the defendant at this point. So, I mean, just a straightforward application of Dameron. So, for those reasons, I would request this court to defer the conviction and not remand for a new trial, and I'm willing to entertain any questions if you have any. Oh, I see. Thank you. I don't see any questions, so thank you. Rebuttal, please. I just want to make a couple of quick points, Your Honor. I definitely do take issue with Ms. Brooks' characterization of Mr. Hilliard as lying about where he was that night. He was never impeached about whether he went to Steak and Shake or not. That was his testimony. The state didn't impeach him. They didn't prove that that's not where he went when he left his house. They referred to the video and his car in the video, but as we previously discussed, it doesn't show him. It doesn't show his license plate. And so it is not impeaching him, and it is not proof that he lied, and so it's an unfair characterization to say that he was lying. Even if there weren't any problems with this evidence, even if the surveillance video was properly admitted and the motive evidence and the lay witnesses, we still do not have enough evidence to find beyond a reasonable doubt that a firearm was discharged into this house by Mr. Hilliard. And so, you know, considering all of the other issues that exist here, Mr. Hilliard at least should be granted new trial because of the cumulative effect that the errors definitely rendered this trial unfair. And even if you try to take the evidence at face value,  whether this projectile object, flattened piece that they found was lead and came from a firearm and not a BB gun or some other type of device, and that Hilliard could have found this house in the first place and was there between 11 or 11.30 p.m. when glass broke, we just don't have any evidence to support those propositions. If this court doesn't have any further questions for me, we'd ask you to reverse Mr. Hilliard's conviction and grant him a new trial. Okay, thanks to both of you. The case is submitted. The court stands in recess until after lunch.